

NUMBER 13-07-00573-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

KIMANE PETRILLOSE,                                                    Appellant,

v.

CHRISTUS SPOHN HEALTH SYSTEM
CORPORATION D/B/A CHRISTUS SPOHN
HOSPITAL CORPUS CHRISTI-SOUTH,                          Appellee.

---

On appeal from the 319th District Court
of Nueces County, Texas.

---

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Benavides
Memorandum Opinion by Justice Rodriguez**

Appellant Kimane Petrillose challenges the summary judgment granted by the trial

court in favor of appellee Christus Spohn Health System Corporation d/b/a Christus Spohn

Hospital Corpus Christi-South (Spohn), which dismissed Petrillose's employment

discrimination and retaliation claims.  By five issues, Petrillose argues that the trial court erred in:  (1) granting summary judgment on her disability discrimination claim; (2) granting summary judgment on her workers' compensation retaliation claim; (3) granting summary judgment on her claim for lost wages and benefits; (4) granting summary judgment on her claim for front pay and back pay during the time she was in school; and (5) sustaining certain objections to summary judgment evidence.  We affirm in part and reverse and remand in part.

## I.  BACKGROUND

Petrillose was employed by Spohn as a nuclear medicine technologist.  During her employment with Spohn, Petrillose suffered numerous injuries to her right knee—both on and off the job—and underwent several surgeries to repair those injuries.  On August 10, 2001, Petrillose tore the anterior cruciate ligament (ACL) in her right knee while playing soccer.  She recovered from that injury and returned to work.  On December 22, 2001, while on the job, Petrillose tore her ACL again when a wheelchair she was pushing suddenly stopped.  She filed a workers' compensation claim in connection with that injury on December 24, 2001.  On August 19, 2002, Petrillose reinjured her right knee on the job when she tripped over a set of x-ray cassettes on the floor of a hospital hallway.  She reported her injury to Spohn the next day.  In March 2003, Petrillose underwent surgery to repair the damage from her August 19, 2002 injury.  She applied for workers' compensation benefits on March 18, 2003.

In early January 2004, Petrillose had another surgery on her right knee.  She took Family Medical Leave Act (FMLA) leave from January 7 to February 1, 2004.  In a note from her doctor dated February 2, 2004, Petrillose was released to work with the following restrictions:  no pushing or pulling; no lifting greater than twenty pounds; no climbing or

heights; and no kneeling or squatting. Petrillose performed her job with these restrictions from February 2 to June 28, 2004.

On June 30, 2004, Petrillose underwent a further knee surgery. Petrillose took additional FMLA leave following that surgery. On August 9, 2004, Spohn received a work status report from Petrillose's doctor indicating that Petrillose would be released to work on August 31, 2004, with, in addition to those from her February 2, 2004 work release, the following restrictions: no bending or stooping; no twisting; no standing or walking for more than two hours; no running; no driving or operating heavy equipment; no lifting weights more than ten pounds; and that she must wear a knee brace at work. Spohn did not accept this return to work authorization. On August 24, 2004, Petrillose's available FMLA leave expired. Spohn informed Petrillose that she was eligible to apply for extended medical leave under Spohn's internal leave of absence policy.

At the end of August 2004, Petrillose decided to have another knee surgery, after which her doctor did not authorize her to return to work.[1] Petrillose applied for and took an extended leave of absence during the fall of 2004 following that surgery. On December 1, 2004, the date Petrillose's extended medical leave expired, Spohn terminated Petrillose's employment. After her termination, Petrillose underwent two further knee surgeries. During the period of her extended leave and after her termination, Petrillose applied for and drew social security disability benefits and long-term disability payments from her private insurer. She also enrolled in college and eventually completed her

---

[1] The parties dispute the events that occurred in August 2004 with regard to Petrillose's return to work authorization. Petrillose contends that, had Spohn not denied her request to return to work with the restrictions contained in the August 9, 2004 work status update, she would not have elected to have the additional knee surgery at the end of August 2004 and would have returned to work with the amended restrictions. Spohn argues there is no evidence Petrillose would have made that decision and that, even if there was, the additional restrictions imposed by the August 9 update prevented Petrillose from performing the essential functions of her job.

bachelors degree in May 2007.  Petrillose was not officially released to work by her doctor until July 21, 2006.

Petrillose filed suit against Spohn, claiming that she was discharged because of her disability and in retaliation for filing a workers' compensation claim.  *See* TEXAS LAB. CODE ANN. §§ 21.051, 451.001 (Vernon 2006).  Spohn filed a no-evidence and traditional motion for summary judgment arguing that it was entitled to:  (1) summary judgment on Petrillose's disability discrimination claim because she was not a qualified individual with a disability; (2) summary judgment on Petrillose's retaliation claim because there was no evidence of a causal link between Petrillose's workers' compensation claims and her termination; (3) summary judgment on Petrillose's claims for lost wages and benefits for the period when Petrillose was unable to work; and (4) summary judgment on Petrillose's claims for back pay and front pay for the period she was in school.  Petrillose responded to Spohn's motion for summary judgment on May 24, 2007.

Spohn filed objections to certain evidence in Petrillose's response to Spohn's motion for summary judgment.  The trial court issued an order granting Spohn's objections and then entered its final judgment, granting Spohn's motion for summary judgment and dismissing all of Petrillose's claims.[2]  However, on the day the judgment was entered, Petrillose filed a motion to set aside the court's order granting Spohn's objections to Petrillose's summary judgment evidence.  Petrillose then filed a motion for new trial, making essentially the same arguments she made in her motion to set aside.  After hearing Petrillose's motions, the trial court decided to deny Spohn's hearsay objections but to grant the remaining objections.  The trial court issued an order (1) granting, in part, and denying,

---

[2] The trial court did not specify whether it was granting Spohn's motion for no-evidence summary judgment or motion for traditional summary judgment or both.

4

in part, Spohn's objections to Petrillose's summary judgment evidence; and (2) re-issuing its judgment granting Spohn's motion for summary judgment and denying and dismissing with prejudice all claims by Petrillose. This appeal ensued.

## II. DISCUSSION

### A. Objections to Evidence

We first address Petrillose's fifth issue—which challenges the trial court's ruling on Spohn's objections to certain statements made by Petrillose in her affidavit in response to the motion for summary judgment—to determine whether we can appropriately consider that evidence in our analysis of the remainder of Petrillose's issues.

#### 1. Standard of Review

We review a trial court's decision to admit or exclude summary judgment evidence for abuse of discretion. *Krishnan v. Law Offices of Preston Henrichson, P.C.*, 83 S.W.3d 295, 299 (Tex. App.–Corpus Christi 2002, pet. denied). A court abuses its discretion if it acts arbitrarily or unreasonably or without reference to guiding rules or principles. *Owens-Corning Fiberglass Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex.1998). However, even if the trial court errs by considering improperly admitted evidence at summary judgment, we will not reverse a trial court's erroneous evidentiary ruling unless the party requesting reversal can demonstrate that the error probably caused the rendition of an improper judgment. TEX. R. APP. P. 44.1. A trial court's ruling on evidence is not usually reversible unless the appellant can demonstrate that the whole case turned on the particular evidence admitted or excluded. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001). Moreover, the exclusion of evidence is harmless if the evidence is merely cumulative of other properly admitted evidence. *Id*.

5

## 2. Analysis

Petrillose complains that the trial court erred in excluding certain statements from her affidavit on the basis that she had no personal knowledge of the underlying facts and/or she was making conclusory statements. "To constitute competent summary judgment evidence, affidavits must be made on personal knowledge, set forth facts as would be admissible in evidence and show affirmatively that the affiant is competent to testify to matters stated therein." *Krishnan*, 83 S.W.3d at 299 (citing TEX. R. CIV. P. 166a(f)). If an affidavit is offered in opposition to summary judgment, it must set forth facts rather than legal conclusions. *Id.* (citing *Larson v. Family Violence & Sexual Assault Prevention Ctr. of S. Tex.*, 64 S.W.3d 506, 514 n.6 (Tex. App.–Corpus Christi 2001, pet. denied)). "Statements of subjective belief are no more than conclusions and are not competent summary judgment evidence." *Id.* (citing *Tex. Div.–Tranter, Inc. v. Carrozza*, 876 S.W.2d 312, 314 (Tex. 1994)).

Spohn objected to the following statements, among others, in Petrillose's supporting affidavit as conclusory, speculative, and not based upon personal knowledge: (1) "During the time I was out on leave in June 2004, the communication with [my supervisor] essentially ceased. She would not take my phone calls[,] and despite leaving repeated messages asking to be put back to work, she did not respond to my phone calls"; (2) "Spohn would not accept me with restrictions"; and (3) "If Spohn had allowed me to return to work on August 30th[, 2004], my physician would not have taken me off work beginning August 31st and I would not have undergone manipulation surgery." Petrillose argues that the statements were based on her personal knowledge and, thus, improperly excluded by the trial court.

6

### a. "[My supervisor] would not take my phone calls . . . ."

Spohn argues that this statement implies that Petrillose's supervisor was aware of each of Petrillose's calls and made a conscious decision not to return the calls. Petrillose contends that she had personal knowledge that she left messages for her supervisor and that she did not receive any return phone calls. However, the statement conveys more than these simple facts. We agree with Spohn that the statement, as a whole, implies that Petrillose's supervisor was purposefully avoiding Petrillose's phone calls. Petrillose had no knowledge of her supervisor's intent. In fact, Petrillose had no knowledge that her messages even reached her supervisor. Accordingly, this statement is not competent summary judgment evidence because it is both speculative and outside the knowledge of the affiant, Petrillose. *See Krishnan*, 83 S.W.3d at 299. We conclude that the trial court did not abuse its discretion in excluding this statement from evidence. Petrillose's fifth issue is overruled to the extent it relates to this complained-of statement.

### b. "Spohn would not accept me with restrictions."

Spohn argues that Petrillose had no personal knowledge as to whether Spohn would have permitted Petrillose to return to work with restrictions. We agree. To support this statement, Petrillose offered the following factual statements: "I made phone calls and sent emails, however my efforts were unsuccessful"; "No one ever responded to my phone calls and emails"; "They were ignoring me, pushing me off"; "Spohn was trying to get rid of me, they didn't want me back to work"; "I was specifically told by a recruiter in human resources not to apply until I had no restrictions." These facts do not establish that Petrillose had personal knowledge of Spohn's underlying reasons for refusing her return to work authorization, and the trial court did not abuse its discretion in sustaining Spohn's objection to the statement. *See Krishnan*, 83 S.W.3d at 299. And even if those facts did

7

establish Petrillose's personal knowledge and the evidence was improperly excluded, the trial court's error would not be reversible because the statement was cumulative of other summary judgment evidence—such as a prior statement in the affidavit that Petrillose was informed at some point during August 2004 that she could not return to work unless she did not have any restrictions. *See Interstate Northborough P'ship*, 66 S.W.3d at 220. We overrule Petrillose's fifth issue in so far as it relates to her statement that Spohn would not accept her back to work with restrictions.

### c. "My physician would not have taken me off work . . . ."

Spohn argues that Petrillose had no knowledge as to whether her doctor would have released her for work if Spohn had accepted the restrictions in her doctor's August 9, 2004 status update. We agree that Petrillose did not offer a sufficient factual basis to establish her personal knowledge of her doctor's state of mind. *See Krishnan*, 83 S.W.3d at 299. However, we believe that she did have personal knowledge of her own state of mind. *See id*. We conclude the trial court erred in excluding the last portion of Petrillose's statement that she "would not have undergone manipulation surgery" if Spohn had allowed her to return to work under the restrictions of the August 9, 2004 status update. *See id*. Moreover, we conclude that this error is reversible because whether or not Petrillose would have chosen to return to work in August 2004 rather than undergo another surgery is a crucial fact issue, without which Petrillose would not have been able to defeat summary judgment. *See Interstate Northborough P'ship*, 66 S.W.3d at 220. We, therefore, sustain Petrillose's fifth issue with regard to her statement that she would not have elected the late August 2004 surgery if Spohn had allowed her to return to work with restrictions.

**B. Summary Judgment**

In her first, second, third, and fourth issues, Petrillose complains that the trial court erred in granting Spohn's motion for summary judgment.

**1. Standard of Review**

We review de novo a trial court's summary judgment decision. *Thomann v. Lakes Reg'l MHMR Ctr.*, 162 S.W.3d 788, 794 (Tex. App.–Dallas 2005, no pet.). In a traditional summary judgment, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Johnson v. Hoechst Celanese Corp.*, 127 S.W.3d 875, 878 (Tex. App.–Corpus Christi 2004, no pet.). In reviewing a summary judgment, we accept as true all evidence favorable to the nonmovant, indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *Davis v. City of Grapevine*, 188 S.W.3d 748, 754 (Tex. App.–Fort Worth 2006, pet. denied) (citing *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005))*; Johnson*, 127 S.W.3d at 878. A defendant is entitled to summary judgment if it conclusively negates "at least one essential element of the plaintiff's cause of action." *Johnson*, 127 S.W.3d at 878 (citing *Am. Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997)). If the movant's summary judgment evidence establishes its right to judgment as a matter of law, the burden shifts to the nonmovant to produce "competent controverting evidence raising a genuine issue of material fact with regard to the element challenged by the defendant." *Niu v. Revcor Molded Prods Co.*, 206 S.W.3d 723, 727 (Tex. App.–Fort Worth 2006, no pet.).

9

In a no-evidence summary judgment, a party moves for summary judgment on the ground that there is no evidence of one or more of the essential elements of a claim on which the adverse party has the burden of proof. TEX. R. CIV. P. 166a(i). The nonmovant must then present evidence raising a genuine issue of material fact on the challenged elements. *Id*. "We review a no-evidence summary judgment under the same standard as a directed verdict." *Thomann*, 162 S.W.3d at 795 (citing *King Ranch v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003)). The record is examined in the light most favorable to the nonmovant, and we credit evidence favorable to the nonmovant if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). Summary judgment is proper if the nonmovant produces more than a scintilla of probative evidence raising a fact issue. TEX. R. CIV. P. 166a(i). "A party produces more than a scintilla of evidence if the evidence allows reasonable and fair-minded people to differ in their conclusions." *Id*.

When the trial court fails to indicate its basis for granting summary judgment, the appellant "'must show it is error to base it on any ground asserted in the motion.'" *Johnson*, 127 S.W.3d at 878 (quoting *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995)). We will affirm the summary judgment if any of the movant's grounds is meritorious. *Id*.

### 2. Disability Discrimination

By her first issue, Petrillose challenges the trial court's granting Spohn's motion for summary judgment on her disability discrimination claim. Specifically, Petrillose argues that she was able to perform the essential functions of her job with reasonable accommodations and that Spohn refused to make such accommodations for her.

Under the Texas Labor Code, an employer cannot discriminate against an employee with regard to compensation or the terms, conditions, or privileges of employment because of race, color, disability, religion, sex, national origin, or age. TEX. LAB. CODE ANN. § 21.051. Because "one purpose of chapter 21 of the labor code" is to execute the policies of the Americans with Disabilities Act, we look to analogous federal law in reviewing a claim for disability discrimination under Texas law. *Thomann*, 162 S.W.3d at 795-96 (citing *Haggar Apparel Co. v. Leal*, 154 S.W.3d 98, 100 (Tex. 2004)). "Accordingly, Texas courts follow federal precedent for guidance when interpreting chapter 21." *Davis*, 188 S.W.3d at 757.

To prevail on a disability discrimination claim, the plaintiff must generally prove that (1) she has a disability, (2) she is qualified for the job, and (3) an adverse employment action was taken because of her disability. *Burch v. City of Nacogdoches*, 174 F.3d 615, 619 (5th Cir. 1999). Here, Spohn did not dispute that Petrillose had a disability and suffered an adverse employment action; Spohn argued solely that Petrillose was not a qualified individual with a disability. Thus, the only relevant inquiry for this Court is whether Petrillose was qualified for her job.

Section 21.105 of the labor code provides that employers can only be held liable for "discrimination because of or on the basis of a physical or mental condition that does not impair an individual's ability to reasonably perform a job." TEX. LAB. CODE ANN. § 21.105 (Vernon 2006). Accordingly, Petrillose had the burden to prove she could reasonably perform, or was "otherwise qualified" for, her job. *Ketcher v. Wal-Mart Stores, Inc.*, 122 F. Supp. 2d 747, 755 (S.D. Tex. 2000). Petrillose can prove she was otherwise qualified for her job by showing that (1) she could perform all essential job functions without accommodations, or (2) with some reasonable accommodation by Spohn, she could have

11

performed the job. *Id*.; *see Davis*, 188 S.W.3d at 758 (holding that a plaintiff establishes her prima facie case based on her employer's failure to provide reasonable accommodation by proving that, with reasonable accommodations, she could perform the essential functions of her job and that the employer refused to make those accommodations).

It is undisputed that Petrillose worked from February through June 2004 with the following restrictions enunciated in her February 2, 2002 doctor's note: no pushing or pulling; no lifting weights more than twenty pounds; no climbing or heights; and no kneeling or squatting. Spohn does not controvert that Petrillose also received positive employment evaluations during this period. It is further undisputed that Spohn refused to allow Petrillose to return to work in August 2004 after Petrillose's doctor presented Spohn with an updated list of restrictions after Petrillose's June 30, 2004 surgery.

In her response to Spohn's motion for summary judgment, and now on appeal, Petrillose contends that the restrictions imposed by the August 9, 2004 doctor's note were the same or similar to the restrictions under which she worked from February through June 2004. Petrillose presented evidence in her summary judgment response that the August 9, 2004 status update sent by her doctor to Spohn added the following restrictions to the list from the February 2, 2004 note: no bending or stooping; no twisting; no running; no walking or standing for more than two hours at a time; no driving or operating heavy equipment; and that Petrillose must wear a knee brace at all times. Petrillose also attached to her summary judgment response an April 29, 2004 email from the Spohn human resources director stating that Petrillose was "for the most part, performing the essential functions of [her] job" with the restrictions of no bending, stooping, pushing, pulling, and lifting. Evidence was adduced showing that, as part of the accommodations

12

being made during the February to June 2004 time period, other hospital employees helped Petrillose transport and lift patients. Moreover, in her affidavit in response to Spohn's motion for summary judgment, Petrillose avers that she would not have undergone the late August 2004 surgery if Spohn had permitted her to return to work under the restrictions from the August 9 status update.[3]

Spohn argues that the additional restrictions imposed in the August 9, 2009 status update prevented Petrillose from being able to perform the essential functions of her job; Spohn contends that the type of activities prohibited by the August 9 status update (e.g. bending and stooping, pushing and pulling, twisting, walking, and standing) were frequent and essential aspects of Petrillose's job. And Spohn disagrees that the evidence demonstrates a history of similar accommodation for those restrictions, instead insisting that the added restrictions transformed the earlier accommodations into an unreasonable burden. However, we cannot draw that conclusion. The relevant inquiry is not whether the August 9, 2004 restrictions prevented Petrillose from performing her job, in general.[4] Rather, the crucial question is whether the restrictions prevented Petrillose from performing the essential functions of her job with or without reasonable accommodations by Spohn. *See Ketcher*, 122 F. Supp. 2d at 755.

---

[3] Having previously concluded that this statement was improperly excluded by the trial court, we now properly consider this evidence in our analysis of Petrillose's first issue. *See Krishnan v. Law Offices of Preston Henrichson, P.C.*, 83 S.W.3d 295, 300, 303 (Tex. App.–Corpus Christi 2002, pet. denied) (reversing trial court's exclusion of certain summary judgment evidence and then considering evidence previously excluded by the trial court in its analysis of plaintiff's summary judgment issue).

[4] Spohn contends that, because Petrillose was never released to work by her doctor after her June 30, 2004 surgery, Petrillose was, as a matter of law, unqualified for her job. In isolation, this fact seems to favor summary judgment. However, in emphasizing this fact, Spohn ignores the evidence adduced by Petrillose contesting the events of August 2004, evidence which creates a fact issue regarding Spohn's decision to deny Petrillose accommodation that may or may not have been substantially similar to the accommodation it granted Petrillose from February through June 2004.

Petrillose's evidence raised fact issues regarding (1) the similarities between the restrictions observed by Petrillose in February through June 2004 and the restrictions in the August 9, 2004 status update; and (2) whether the accommodations made during the earlier part of 2004 would have sufficed to alleviate the problems raised by the August 9 restrictions. This evidence is particularly compelling in light of Petrillose's affidavit testimony that she would have returned to work had Spohn not refused her August 2004 work authorization with the attendant restrictions.

As a result, we conclude that Petrillose has come forward with more than a scintilla of evidence that she was otherwise qualified for her job, i.e. that she would have been able to perform the essential functions of her job under the new restrictions from the August 9, 2004 doctor's note. *See* TEX. R. CIV. P. 166a(i). Moreover, we conclude that Petrillose's evidence, viewed in the light most favorable to her, creates a genuine issue of material fact as to whether she was otherwise qualified for her job and that Spohn failed to conclusively negate this element of Petrillose's claim as a matter of law.[5] *See* TEX. R. CIV. P. 166a(c); *Johnson*, 127 S.W.3d at 878.

Spohn argues that Petrillose is estopped from proving that she was qualified for her job because of inconsistent statements Petrillose made in her applications for Social

---

[5] Spohn also argues Petrillose failed to present evidence of pretext or intentional discrimination to refute Spohn's legitimate, nondiscriminatory reason for her termination, that it had administratively terminated her employment when she exhausted all of her available medical leave. Spohn contends that after it proferred its nondiscriminatory reason, Petrillose was obliged to come forward with probative evidence that Spohn's reason was false and that discrimination was the true reason behind her termination, citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143, 147-48 (2000). However, Spohn incorrectly applies this particular burden-shifting framework to Petrillose's first issue—the burden-shifting test does not apply to claims that an employer has failed to make reasonable accommodations. *See Davis v. City of Grapevine*, 188 S.W.3d 748, 758-59 (Tex. App.–Fort Worth 2006, pet. denied). In such a claim, "the employee has the burden to show that the employer failed to implement a reasonable accommodation, and the employer can defend by showing a business necessity or undue burden." *Id*. at 758. Here, Spohn does not prove that the requested accommodations would impose an undue burden. Petrillose, thus, succeeded in creating a genuine issue of material fact by providing evidence that Spohn rejected accommodations similar to those that it had previously accepted.

14

Security Disability Insurance (SSDI) and long-term disability insurance from her private insurance carrier. In *Cleveland v. Policy Management Systems Corporation*, the United States Supreme Court held that a disability discrimination plaintiff who has filed an earlier claim for SSDI benefits "cannot simply ignore the apparent contradiction" between the sworn statement that she was "unable to work" made in her SSDI application and the contention that she is an otherwise qualified individual for purposes of her disability discrimination claim. 526 U.S. 795, 806 (1999). In such a situation, the plaintiff must offer "an explanation of any apparent inconsistency . . . sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in the earlier statement, the plaintiff could nonetheless perform the essential functions of her job, with or without reasonable accommodation." *Id*. at 807. Importantly, the court cautioned that an SSDI application does not automatically estop a plaintiff from pursuing a claim for disability discrimination. *Id*. at 805-06. The court reasoned that a disability discrimination "suit claiming that the plaintiff can perform her job with reasonable accommodation may well prove consistent with an SSDI claim that the plaintiff could not perform her own job (or other jobs) without it." *Id*. at 803.

In *Johnson v. Hoechst Celanese Corporation*, this Court directly addressed *Cleveland* and the estoppel issue in the context of an application for long-term disability benefits from a private insurer. *Johnson v. Hoechst Celanese Corp.*, 127 S.W.3d 875, 880-82 (Tex. App.–Corpus Christi 2004, no pet.). In *Johnson*, we held that, merely because she represented in her application for privately insured long-term disability benefits that she was "totally disabled and unable to work," a plaintiff was not estopped from asserting that she could work with reasonable accommodation but was discriminated

15

against on the basis of disability because her employer refused her request for accommodation. *Id.*

Here, Petrillose applied for long-term disability benefits from her private insurer in September 2004; she applied for SSDI benefits later in the fall of 2004. Any representations made on these applications proceeded Spohn's decision to deny Petrillose's return to work authorization. In other words, at the time Spohn determined that Petrillose could not return to work under the restrictions from her doctor's August 9, 2004 status update, Petrillose had not yet made any declarations regarding her total inability to work. We conclude that Cleveland's estoppel doctrine does not apply to the facts of this case. Petrillose produced evidence that she would have returned to work under the restrictions from the August 9 status update and would not have elected the surgery she underwent at the end of August if Spohn had allowed her to return to work accommodated by those restrictions. Having made that decision in light of Spohn's rejection of her return to work authorization, Petrillose then applied for long-term disability benefits to guarantee some sort of income after the late August 2004 surgery. We refuse to foreclose this option to plaintiffs. If we were to do so, potential plaintiffs would be prevented from seeking disability benefits to which they are entitled after an employer has engaged in allegedly discriminatory conduct in order to shield their future claim from this estoppel defense. We conclude that such a result would not promote the rationale of *Cleveland*, which expressly declined to erect absolute barriers to disability discrimination plaintiffs who had afforded themselves of the opportunity to maintain their incomes even in the face of possible discrimination. *See Cleveland*, 526 U.S. at 802-03.

Petrillose's first issue is sustained.

16

### 3. Retaliation

By her second issue, Petrillose argues that the trial court erred in awarding summary judgment to Spohn on her workers' compensation retaliation claim. Petrillose contends that Spohn did not disprove, as a matter of law, a causal connection between her workers' compensation claims and her termination.

Under the Texas Labor Code, an employer may not discharge an employee for filing a good faith workers' compensation claim. TEX. LAB. CODE ANN. § 451.001(1). In response to an employer's motion for summary judgment, the employee plaintiff must make a prima facie case of retaliation by demonstrating a causal link between her termination and the filing of a workers' compensation claim. *Garcia v. Allen*, 28 S.W.3d 587, 600 (Tex. App.–Corpus Christi 2000, pet. denied). The employee need not prove that retaliation was the sole cause of her termination. *Green v. Lowe's Home Ctrs., Inc.*, 199 S.W.3d 514, 518 (Tex. App.–Houston [1st Dist.] 2006, pet. denied). Rather, "[she] must show that, 'but for' the filing of the claim, the discharge would not have occurred when it did." *Id.* (quoting *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 386 (Tex. 2005)). The causal link "may be established by direct or circumstantial evidence." *Garcia*, 28 S.W.3d at 600. "Circumstantial evidence sufficient to establish a causal link between termination and filing a compensation claim includes:

> (1) knowledge of the compensation claim by those making the decision on termination; (2) expression of a negative attitude toward the employee's injured condition; (3) failure to adhere to established company policies; (4) discriminatory treatment in comparison to similarly situated employees; and (5) evidence that the stated reason for the discharge was false.

*Cont'l Coffee Prods. v. Cazarez*, 937 S.W.2d 444, 451 (Tex. 1996).

17

If the employee meets her prima facie burden to establish the causal connection, the burden then shifts to the employer to "rebut the alleged improper termination by showing there was a legitimate reason behind it."[6] *Garcia*, 28 S.W.2d at 600 (citing *McIntyre v. Lockheed Corp.*, 970 S.W.2d 695, 697-98 (Tex. App.–Fort Worth 1998, no pet.)). Once the employer makes such a showing, to survive the motion for summary judgment, the burden shifts back to the employee to produce controverting evidence raising a fact issue as to a retaliatory motive. *Id*. Long time periods between the claim for benefits and the termination "'militate[] against a finding of retaliation.'" *Burch*, 174 F.3d at 623 (quoting *Burfield v. Brown, Moore & Flint, Inc.*, 51 F.3d 583, 590 (5th Cir. 1995)) (concluding that a 15-16 month period between the filing of the claim and discharge weighs against the existence of retaliatory motive); *see Tri-County Elec. Coop., Inc. v. Tidwell*, 859 S.W.2d 109, 112 (Tex. App.–Fort Worth 1993, writ denied) (finding no inference of retaliatory motive where employee plaintiff remained on the employer's payroll for two years after the filing of his workers' compensation claim). Moreover, absent other competent evidence of retaliation, an employee's subjective beliefs and impressions will not suffice to prove retaliatory motive. *Burch*, 174 F.3d at 623 (citing *Tex. Div.–Tranter, Inc. v. Carrozza*, 876 S.W.2d 312, 314 (Tex. 1994)).

Petrillose contends that there is circumstantial evidence sufficient to establish a prima facie causal connection between her workers' compensation filings and termination. It is undisputed that Spohn had knowledge of her claims. Petrillose produced evidence

---

[6] Although we previously concluded that a burden-shifting analytical framework does not apply to Petrillose's claim that Spohn failed to make reasonable accommodations, a burden-shifting analysis is proper for Petrillose's workers' compensation retaliation claim. *See Garcia v. Allen*, 28 S.W.3d 587, 600 (Tex. App.–Corpus Christi 2000, pet. denied).

18

that her supervisor made sarcastic remarks to her when Petrillose reported her August 19, 2002 injury.[7] The record also contains evidence that Spohn hired a temporary replacement for Petrillose in late July 2004, and that the replacement was made a permanent employee on September 17, 2004. Petrillose produced evidence that Spohn retained another injured employee who, because she was confined to a wheelchair, had more severe restrictions that Petrillose. Finally, Petrillose asserts that, while at work at the hospital, she heard general comments by other employees that Spohn "always find[s] a way to get rid" of employees who are injured on the job.

Despite the foregoing circumstantial evidence, we cannot conclude that Petrillose demonstrated a causal link between her filing for workers' compensation benefits and her termination. First, Spohn's knowledge of the filings, alone, is not sufficient to establish a causal link. *See Green*, 199 S.W.3d at 519. Next, absent evidence of the negative attitude of Spohn employees who actually make termination decisions, we do not find that the sarcastic comments of Petrillose's supervisor on one occasion prove any animosity on the part of Spohn against injured employees. *See M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 25 (Tex. 2000) (noting that stray remarks that were remote in time from the challenged termination and were made by someone not directly involved with the termination decision are not competent summary judgment evidence). Neither can we conclude that Petrillose was discriminated against in comparison to similarly situated employees. Petrillose produced evidence of one other injured employee who had been transferred to a different position as an accommodation for her confinement to a

---

[7] Petrillose produced no evidence that her supervisor was involved in the decision to terminate Petrillose's employment or had the general authority to make termination decisions. *See Autozone v. Reyes*, 272 S.W.3d 588, 592-93 (Tex. 2008).

19

wheelchair. However, the evidence does not show that Petrillose was similarly situated to that employee because, unlike the relatively active nature of Petrillose's position, the position to which the other injured employee was transferred was almost entirely sedentary. *See Autozone v. Reyes*, 272 S.W.3d 588, 594 (Tex. 2008) (holding that the situation of the compared employees must be "nearly identical," i.e. "[e]mployees with different responsibilities, supervisors, capabilities, work rule violations, or disciplinary records" are not similarly situated) (internal citations omitted); *see also Williams v. Corpus Christi Indep. Sch. Dist.*, No. 13-04-00455-CV, 2006 WL 2022502, at *7 n.3 (Tex. App.–Corpus Christi July 20, 2006, pet. denied) (applying the "nearly identical" standard in the context of a workers' compensation retaliation claim).

Furthermore, we conclude that the temporary, and eventually permanent, employment of another nuclear medical technologist did not violate Spohn's internal policies and is, thus, not circumstantial evidence of a causal link. As part of her response to Spohn's motion for summary judgment, Petrillose produced a copy of Spohn's leave-of-absence policy. The policy expressly provides that employees who have exhausted their leave available under the Family Medical Leave Act (FMLA) and who then take extended medical leave "are not guaranteed reinstatement to work or placement in their former or alternate job position." Petrillose does not dispute that she exhausted her FMLA leave on August 24, 2004. As such, Spohn acted according to its policy when it permanently hired another nuclear medical technologist to replace Petrillose on September 17, 2004.

Moreover, Spohn was well within its rights to hire a temporary employee to cover Petrillose's duties while she was out for surgery in July 2004. In her brief to this Court, Petrillose contends that "Spohn replaced [her]" with another nuclear medical technologist

20

in late July 2004; however, Petrillose does not acknowledge the distinction between a temporary employee and permanent replacement. Although Spohn was not permitted to fill Petrillose's position, as per its leave of absence policy, before the expiration of her FMLA leave, we cannot conclude that Spohn was not entitled to engage temporary, flexible assistance while Petrillose was out for surgery. Petrillose does not dispute that only she and her supervisor were qualified to perform the duties of the nuclear medical technologist position. It is also uncontroverted that Petrillose's supervisor had numerous duties independent of any assistance she provided to the technologist. Under the facts of this case—where an employer is faced with the lengthy absence of an employee who is, if not solely responsible for, one of only two people who can perform a particular job—we refuse to tie employers hands and, therefore, decline to conclude that Spohn was not allowed to hire a temporary employee to perform Petrillose's duties while she was out on medical leave. In sum, based on the foregoing, we conclude that Petrillose has not made a prima facie causal connection between her termination and workers' compensation claims, i.e. that "but for" her workers' compensation filings Spohn would not have terminated her employment when it did. *See Garcia*, 28 S.W.2d at 600; *Green* 199 S.W.3d at 518.

And even if we were to conclude that Petrillose established a prima facie case of retaliation, Spohn met its burden in this summary judgment proceeding to show that it had a legitimate, nondiscriminatory reason for Petrillose's termination. *See id*. Spohn proffered evidence that Petrillose was terminated because she had exhausted all leave available to her under Spohn's employment policy, and as a result, Spohn administratively terminated her employment on December 1, 2004. In response to this nondiscriminatory reason, Petrillose did not produce sufficiently controverting evidence of retaliatory motive. Although

21

Spohn admittedly had knowledge of Petrillose's filings, nearly three years elapsed between Petrillose's first filing on December 24, 2001 and her termination on December 1, 2004. This long period of time negates any inference that Petrillose's termination was in retaliation for her workers' compensation filings. *See Tidwell*, 859 S.W.2d at 112. Additionally, Petrillose's assertion, based on overheard conversations, that Spohn looks for ways to terminate injured employees is nothing more than a generalized impression or belief. This sort of subjective speculation is insufficient to support Petrillose's contention of retaliatory motive. *See Burch*, 174 F.3d at 623. Petrillose did not produce sufficient controverting evidence of retaliatory motive to refute Spohn's legitimate, nondiscriminatory reason for her discharge. *See Garcia*, 28 S.W.2d at 600.

We, therefore, conclude that the trial court did not err in granting no-evidence and traditional summary judgment in favor of Spohn on Petrillose's claims for workers' compensation retaliation. Petrillose did not produce more than a scintilla of evidence of the elements of her claim. *See* TEX. R. CIV. P. 166a(i). And Spohn conclusively proved that Petrillose could not establish all elements of her retaliation claim and that, therefore, it was entitled to summary judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c). Petrillose's second issue is overruled.

### 4. Lost Wages and Benefits; Front and Back Pay

In her third and fourth issues, Petrillose argues that the trial erred in awarding Spohn summary judgment on her claims for lost wages and benefits between June 24, 2004 and July 21, 2006, and front and back pay for the time Petrillose was enrolled in school. She urges that, because Spohn could have reasonably accommodated her limitations and because she would have returned to work in August 2004 if reasonable accommodations

22

had been offered, there is a genuine issue of material fact and Spohn has not established as a matter of law that Petrillose was unable to work during this time period and that she would have voluntarily chosen to return to school. We agree.

Lost wage damages are properly measured as the amount of money an employee would have earned had she not been illegally terminated, less the amount she did earn after her termination. *West Telemarketing Corp. Outbound v. McClure*, 225 S.W.3d 658, (Tex. App.–El Paso 2006, pet. granted, judgm't vacated w.r.m.) (citing TEX. LAB. CODE ANN. § 21.258(c) (Vernon 2006)). Spohn argues that, because Petrillose was physically unable to work from June 29, 2004 to June 21, 2006, she cannot show that she suffered any lost wages. Spohn also contends that Petrillose failed to mitigate her damages when she enrolled in school to finish her bachelor's degree and should, thus, be precluded from recovering a double benefit, i.e. both front and back pay and her future earning potential as a result of her degree. However, as previously discussed, Petrillose produced evidence creating a fact issue as to whether she would have, in August 2004, returned to work and not undergone further knee surgery if Spohn had permitted her to return to work under the restrictions from her doctor's August 9, 2004 status update. This evidence could prove that, absent Spohn's allegedly discriminatory action, Petrillose would have continued in her job for those years instead of electing further surgeries and enrolling in school. Based on that evidence, reasonable and fair-minded jurors could differ in their conclusions as to whether Petrillose suffered damages as a result of her discriminatory termination. We conclude that there remains a material issue of fact regarding Petrillose's damages. *See* TEX. R. CIV. P. 166a(c). Petrillose's third and fourth issues are sustained.

23

### III. CONCLUSION

The final judgment is affirmed in so far as it grants summary judgment on Petrillose's claim for retaliation. We reverse and remand the portions of the judgment granting summary judgment on Petrillose's claims for disability discrimination, lost wages and benefits, and front and back pay.

NELDA V. RODRIGUEZ
Justice

Memorandum Opinion delivered and
filed this 20th day of August, 2009.